UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:                                              Case No.: 17-13077-7

TODD G. GOLDBECK and
JODI L. GOLDBECK,

              Debtor.

SUMMIT CREDIT UNION,

                    Plaintiff,

        v.                                          Adversary No.: 17-103

TODD G. GOLDBECK,

              Defendant.

## **MEMORANDUM DECISION**

Debtors Todd and Jodi Goldbeck ("Defendant" or "Goldbeck" when referring to Todd Goldbeck and "Debtors" when referred to jointly) filed a chapter 7 petition. Summit Credit Union ("Summit") filed this adversary proceeding seeking to declare a judgment against Goldbeck nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(2)(B), and (a)(6).

Summit moved for summary judgment with supporting affidavits. Defendant opposes the motion. He submitted an affidavit of counsel attaching three exhibits.[1]

---

[1] Defendant's brief contains 32 references to pages and lines from depositions. Of those references, only 11 are in the record. Only Plaintiff submitted any portions of those depositions.

**FACTS**

Defendant is a physical therapist and athletic trainer. Hoping to expand his practice, he formulated a plan to build his own facility (the "Facility"). In support of that project, Defendant worked with the University of Wisconsin-Whitewater to prepare a feasibility study for a fitness facility in Jefferson, Wisconsin. The study concluded there was an opportunity for a new training center.

Bolstered by the study, Defendant began soliciting investors and lenders. In the fall of 2014, Defendant met with James Holden ("Holden"), a Summit Vice President, and Jason Herlitzke ("Herlitzke"), the Small Business Administration ("SBA") contact at Summit. In December 2014, Defendant sent the feasibility study, a business plan, and some projections to Summit. The next month he told Summit a local economic development authority had agreed to make a loan for equipment for the Facility.

By August 2015, discussions with Summit and the SBA were proceeding in earnest. Defendant provided a signed "General Building Specifications and Cost Estimate" dated April 27, 2015, to Summit for a 47,800 square foot facility at a cost of $2,234,343.90. Defendant and Summit negotiated and eventually agreed to terms to finance the Facility.

The parties anticipated and arranged for the financing to be in the form of an SBA loan. Defendant consulted with Business Lending Partners ("BLP"), a private non-profit organization that services and processes SBA 504 loans. Defendant represented he had already bought some equipment and stated it

2

cost $50,000. The month after, Defendant said the equipment would cost about

$150,000 and he factored that amount into his Projected Opening Balance

Sheet. He again produced a construction budget asserting the "total

construction cost" would be about $2.5 million. He said he was putting

together a list of the existing equipment. He also gave Summit final plans and

specifications for the building. The plans show a complete, usable building.

Defendant admits nothing in the plans "indicates that the construction costs

identified . . . are for anything other than a completed building."

References to a second phase of construction appear in the emails

between Defendant and Summit. The references begin with an indication that

Defendant will "have the option to purchase 5 more acres . . . whenever that

time comes." The precise details of phase 2 are not defined, although there are

references to basketball and tennis courts and another 90,000 square feet of

construction. It appeared phase 2 was to consist of an expansion of a by-then

fully completed facility. As noted in his exchange with BLP, Defendant

anticipated he would buy additional equipment when he had the budget to do

so.

To minimize its risk, Summit required Defendant to rent out some of the

Facility and procure a signed lease before the execution of the loan. Summit

also wanted an assignment of rents to support payments as they came due.

Defendant told Summit that Watertown Regional Medical Center ("WRMC")

intended to lease space in the Facility. In August, Defendant sent Summit a

lease between the Facility and WRMC purportedly signed by WRMC (the "WRMC Lease"). The loan was then closed.

Shortly after the execution of the loan, Defendant emailed Summit about financing for phase 2. By then, the project was already $500,000 over the budget presented to Summit. Defendant asserted he needed another $805,000 for the land purchase for phase 2. Defendant suggested that the interest in the project had been overwhelming and he "would need more equipment to handle [the new members'] needs." In response, Holden expressed shock the project was over budget and advised Defendant to "get phase 1 completed, financially stable, and then look at the next phase." By October, Defendant had secured a $600,000 line of credit from a "high school classmate."

Toby Krause ("Krause"), sole proprietor of T. Krause Custom Builders, LLC, was the contractor for the project. Defendant knew Krause from previous construction projects and from high school. Krause saw the plans and specifications from the architects. Before preparing a budget, Krause obtained bids from subcontractors. Based on the bids, the cost to construct a finished facility approached $5 million. He then prepared a budget and contract that Defendant signed. The contract was not in an amount based on the bids.

In April 2015, Krause prepared the cost estimate. It said the actual cost would be $2,770,707.90. Krause testified that the budget submitted to Summit was for only about half of the construction cost. According to Krause, Defendant instructed the budget should be for half the cost. The estimate did not include finish materials inside. Krause testified that Defendant was aware

4

of that fact. Krause, with Defendant, also prepared an actual budget reflecting the genuine cost of the project. In the late summer or fall of 2015, before construction began, that new construction contract and budget were prepared and signed but not given to Summit.

Defendant used the estimate and agreement of $2,770,707.90 when he applied for the Summit loan. He explained that he would be saving money because of his relationship with many subcontractors. Even so, he knew this price was false.

In September, Defendant knew a final construction contract was needed to close the loan. Defendant gave Summit a signed contract with Krause. It said the cost was "not to exceed $2,570,000.00." The contract conveyed it was for the construction of a completed facility per the plans and specifications previously submitted.

The loan closed. Simultaneous with the execution of the loan, Defendant's company, Xcel Sports Complex, LLC, and Summit entered into a Construction Loan Disbursement Agreement ("Disbursement Agreement") with Fidelity Land Title, Ltd. ("Fidelity"). Under that agreement, financing for the project would flow through Fidelity under the terms defined in the Disbursement Agreement.

A later cost estimate dated November 30, 2015—after the parties signed the loan—projected the cost would be $4,548,185. Krause testified the estimate given to Summit applied only to half the project. He also agreed that nothing in that estimate would reveal it applied to less than the whole project.

5

John Graf, the former Senior Vice President and Chief Financial Officer of WRMC, is the person whose signature seems to appear on the WRMC Lease. Graf acknowledges in an affidavit that there were some discussions with Defendant about the possibility of a lease for medical office space. He denies signing the supposed WRMC Lease and confirms he authorized no other person to sign his name.

By March 2016, Defendant's delicately built house of cards finally collapsed. Defendant admitted the "reality is the current budget is $4,913,139 . . . we need another 2 million dollars to finish the building." Debtor confessed the original budget he provided during the loan negotiation was inaccurate. He declared the total cost "was always 4.9 Million, since the day we signed the papers. As soon as I asked about more money, and you reacted the way you did, I knew the best way to handle it was to keep the project going and address it later." Aff. of David M. Pelletier, Ex. B22, ECF No. 14, Attachment 1.

Defendant casts blame on Summit for the ordeal. His argument is his email from March 2016 saying that he "was lead [sic] to believe that anything else [he] needed for funds . . . would not be a problem." *Id.* at B23. No support in evidentiary form is provided for this argument. Around the same time, Defendant withdrew funds directly from the loan account in violation of the Disbursement Agreement.

In late 2016, Summit foreclosed on the Facility and obtained a judgment for money due under the loan. The state court entered an order in favor of Summit on all its claims and awarded a judgment to Summit against Debtor

for $2,488,218.12. At foreclosure, the property sold for $900,000, leaving a

deficiency of $1,645,856.30.

Plaintiff contends Goldbeck presented the budget with an intent to

deceive. Plaintiff also argues he forged the signature on the WRMC Lease to

induce Summit to execute the note. Defendant argues he did not intentionally

mislead Summit or forge the WRMC Lease.

## DISCUSSION

A. <u>Standards for Summary Judgment</u>

Summary judgment is proper "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law." Fed. R. Civ. P. 56(a) (made applicable through Fed. R.

Bankr. P. 7056). The Court must view all facts and indulge all inferences in the

light most favorable to the Defendant and determine whether there is a genuine

issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986).

As a procedural matter, on summary judgment "the burden is on the

moving party to establish that there is no genuine issue about any material

fact, or that there is an absence of evidence to support the nonmoving party's

case, and that the moving party is entitled to judgment as a matter of law." 20

Charles Alan Wright, Arthur R. Miller & Edward Cooper, *Federal Practice and

Procedure* § 105 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

The nonmoving party—the Defendant—must present evidence to show

there is a genuine issue for trial. This evidence does not have to be "in a form

that would be admissible at trial in order to avoid summary judgment." *Celotex,*

477 U.S. at 324. The nonmoving party may oppose the motion by "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

"[F]acts not in the record are not considered at the summary judgment stage." *Paiva v. Wall*, No. 15-166 S, 2017 WL 35708, at *2 (D.R.I. Jan. 4, 2017). Arguments that depend on facts not in the record are unlikely to succeed. *See Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir. 1990).  When opposing parties tell two different stories, and one is blatantly contradicted by *the record*, so that no reasonable jury could believe it, the court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Movant submits evidence in the form of affidavits with portions of deposition transcripts of Defendant and Krause. Certain exhibits from those depositions are also submitted by affidavit. Movant also provides affidavits from John Graf, Kim Kalepp, and James Holden.

By contrast, opposition to the motion is scant. In fact, the only submission by Defendant is an affidavit of counsel appending copies of three deposition exhibits—the initial cost estimate, an email exchange between Jason Herlitzke and Defendant with a document purporting to be the WRMC Lease, and the "revised" cost estimate. While Defendant cites various pages from

depositions, Defendant provided none. Plaintiff submitted the few cites that are in the record.[2]

B. <u>False Pretenses, False Representations, or Fraud Under 11 U.S.C. § 523(a)(2)(A)</u>

Under section 523(a)(2)(A), a debtor may not discharge a debt "obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." A finding of nondischargeability for false pretenses or false representation requires the creditor to establish the debtor made a knowingly "false representation of fact . . . with an intent to deceive," and "upon which the creditor justifiably relied." *Zamora v. Jacobs* (*In re Jacobs*), 448 B.R. 453, 471 (Bankr. N.D. Ill. 2011). A false representation in this context includes spoken and written statements, in addition to "conduct intended to create and foster a false impression." *Id.*

Scienter is a required element of any cause of action under section 523(a)(2)(A). *Id.* For purposes of false pretenses or actual fraud, "intent to deceive is measured by the debtor's subjective intention at the time the representation was made." *Id.* at 472. To survive Plaintiff's motion for summary judgment, Defendant must produce some evidence to show there is a genuine dispute of fact over whether Defendant possessed the requisite intent under section 523(a)(2)(A).

---

[2] The Court disregards references to pages from depositions not submitted and that are not in evidence on summary judgment. As *Celotex* makes clear, a motion for summary judgment should be granted "so long as whatever is *before the . . . court* demonstrates that the standard for the entry of summary judgment . . . is satisfied." *Celotex Corp. v. Catrett*, 477 U.S. at 323-24 (emphasis added) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . .")

*1. Defendant Knowingly Submitted A False Construction Budget*

Defendant repeatedly represented the total cost of the project would be between $2 and $2.5 million. In November 2014, he asked Holden to estimate the interest rate on a $1.7 million loan. In January 2015, Defendant requested the loan amount be $2.5 million so he "would definitely have all the working capital we need." In April, Defendant emailed Holden, Herlitzke, and Engel saying, "final construction costs attached." The attached document contains an itemized list of costs totaling $2,770,707.90. Nowhere in any of those exchanges did anyone—including Defendant—suggest the $2.7 million encompassed less than the finished and operating facility.

Defendant admits the $2.5 million construction contract represented only half of the cost of the project. His brief argues that Summit understood from the beginning that the entire project would cost about $5 million. He argues phase 1 consisted of building the exterior and phase 2 would finish the "build-out" and the interior. Nowhere, however, does he submit any evidence to support those arguments. Defendant knew the $2.5 million loan would produce only a building shell, which presumably would be unusable for any profit-generating purpose. There is nothing in the record, however, that intimates Summit knew Defendant would need another $2.5 million to finish the Facility.

While there was discussion of the SBA loan cap of $5 million, there is no evidence Summit or the SBA were aware the cost of phase 1 would in any way approach that number. The discussion of phase 2 was only for the potential of

10

more land for an expansion. Defendant concedes nothing indicated funds

beyond the loan amount would be needed for a completed building.

Defendant's argument is unsupported by any evidence. Frankly, it makes

no sense. First, Defendant admitted he intentionally misrepresented the total

construction cost before the parties executed the loan. Second, he admits

providing a budget to Summit for a project cost of $2.5 million. Third, he

admits the budget was not the actual cost of a completed facility. His March

2016 email confirms the actual budget "was always 4.9 Million, since the day

we signed the papers." In fact, he goes on to admit he misrepresented the

construction cost with intent to procure the loan, writing:

> Honestly, you both freaked out on me when I asked
> about needing more money for the project, so I showed
> you a version that was under significantly, so you
> wouldn't start yelling again. . . .
>
> As soon as I asked about more money, and you (Holden)
> reacted the way you did, I knew the best way to handle
> it was to keep the project going and address it later,
> which is what I'm doing now. . . .
>
> I'll send you the budget and numbers I gave the other
> bank. I'd be happy to take out a separate loan for the 2
> million, if you would approve it, at whatever fair rate
> you would offer. We need to get the project finished.
> That's how we're going to get through this.

Aff. of Pelletier, Ex. B22.

### 2. Defendant Intended to Mislead Summit

Because direct evidence of fraudulent intent is rarely available, disputes under section 523(a)(2)(A) often are fact intensive, time consuming, and require an elevated level of scrutiny by the finder of fact. This is an exception to the typical case.

Defendant admits he knew the total cost of construction was higher than $2.5 million when he signed the loan. He concedes he failed to disclose the actual total cost to Summit out of fear it would refuse to finance the project. He acknowledges that, all along, he intended to reveal the final cost only after Summit had expended substantial funds on the project. Defendant apparently knew or hoped that once Summit disbursed $2.5 million, it might be his hostage.

Defendant's interpretation of the transaction makes no sense from the standpoint of commercial reasonableness. Under the loan, Summit's security was a first priority lien on the Facility and its land. An appraiser's report prepared by the SBA in June 2015 concludes the value of the undeveloped property was $120,000. It would have made little sense for Summit to invest $2.5 million to construct an empty building with no commercial use on a plot of land with *de minimis* value relative to the loan amount.

Herlitzke instructed Defendant to get phase 1 finished and financially stable before he embarked on phase 2. Defendant did not respond that phase 1 would only result in an empty shell building. He continued to let Summit

believe the $2.5 million loan would result in a completed facility capable of generating income from rent and membership fees.

Defendant zealously argues Summit intentionally structured the transaction as two separate loans to get around the dollar limit set by the SBA. There is, however, no evidence in the record to support this argument.

The SBA authorization also anticipated the initial loan would result in a completed building. It stipulates $2,225,500 would be used "to construct a building"—not a building shell.

### 3. *The Debt is Nondischargeable Under 11 U.S.C. § 523(a)(2)(A)*

Plaintiff has satisfied the elements of section 523(a)(2)(A) for purposes of summary judgment. There is no material dispute over whether Defendant misrepresented the total cost of construction—he did. There is also no dispute that Defendant made the misrepresentation with an intent to deceive—again, by his own admission, he intended the deceit. He presented a project budget, plans, and a lease on which Summit relied in making the loan. His continued use of the false information was certainly intended to foster a continued false picture of the project and its costs.

There are no genuine disputes of material fact. There is an absence of evidence to support Defendant's opposition. Plaintiff has established that Defendant violated section 523(a)(2)(A) and is entitled to summary judgment on that claim.

### 4. The WRMC Lease

Plaintiff raises an alternative theory under section 523(a)(2)(A) that Defendant forged the signature on the WRMC Lease. Mr. Graf attests he signed no lease. He says he told Defendant in early 2017 that WRMC was not interested in leasing any part of the Facility. Defendant merely submitted a copy of the purported lease through an affidavit of counsel. He submitted no affidavit himself about the lease. There is no support in the record for any conclusion that Graf signed the lease. Defendant submitted no evidence to suggest when or how he obtained a document purporting to bear a signature by WRMC.

It troubles the Court that Defendant does not recall whether he met any person to sign the lease. He does not recall whether he met with the hospital, although he said WRMC "agreed to get it finished up" and that he was meeting with them to have the lease signed. He also said he didn't believe he met John Graf at any point.

For purposes of summary judgment, the Court cannot conclude whether there was a forgery. As a result, it cannot grant Plaintiff's motion on this alternative theory. The evidence, however, suggests there was no WRMC Lease. That may, with further evidence, also support a conclusion that Defendant misrepresented facts about the WRMC Lease to Summit. It is not, however, necessary for the Court to reach a conclusion on this alternative theory.

C. <u>False Financial Statements Under 11 U.S.C. § 523(a)(2)(B)</u>

Section 523(a)(2)(B) excepts from discharge debts for obtaining money,

property, or services through the use of a false financial statement. The

creditor must prove by a preponderance of the evidence that the debt was

obtained by the use of a statement: (1) in writing; (2) that is materially false; (3)

respecting the debtor's or an insider's financial condition; (4) on which the

creditor to whom the debtor is liable . . . reasonably relied; (5) that the debtor

caused to be made or published with the intent to deceive. *Ins. Co. of N. Am. v.*

*Cohn (In re Cohn)*, 54 F.3d 1108, 1114 (3d Cir. 1995). "Materially false" means

misrepresentation of information that "would normally affect the decision to

grant credit." *Cmty. Bank of Homewood v. Bailey (In re Bailey)*, 145 B.R. 919,

930 (Bankr. N.D. Ill. 1992). To prove intent, the creditor must either show the

debtor made the false statements knowingly or with reckless disregard for the

truth. *Cohn*, 54 F.3d at 1119.

With one exception, Plaintiff has established each element of section

523(a)(2)(B). Defendant provided construction budgets in writing. Those

budgets were materially false. Summit reasonably relied on the budgets.

Defendant sent them with an intent to deceive. That leaves whether

Defendant's statements relate to his financial condition.

Circuits are split on what constitutes a statement respecting a debtor's

"financial condition." The Seventh Circuit has not weighed in on the matter,

but many bankruptcy courts in this Circuit have interpreted "financial

condition" narrowly as statements that specifically show net worth. *See*

15

*Gehlhausen v. Olinger (In re Olinger)*, 160 B.R. 1004, 1010 (Bankr. S.D. Ind. 1993). A transactional document, like a check, merely implying a certain financial status is not enough. *Gasunas v. Yotis (In re Yotis)*, 548 B.R. 485, 500 (Bankr. N.D. Ill. 2016); *see also FDIC v. Barrick (In re Barrick)*, 518 B.R. 453, 460 (Bankr. N.D. Ill. 2014). Some other circuits have adopted a broader reading that includes an assertion "regarding ownership of an asset or the existence or nonexistence of an encumbrance." 4 *Collier on Bankruptcy* ¶ 523.08[2][c] (Alan N. Resnick & Henry J. Sommers eds., 16th ed.).

Summit asserts Defendant violated section 523(a)(2)(B) when he submitted a balance sheet that claimed total construction costs of $2.5 million. It appears Summit relies on the broader interpretation of "financial condition" and argues the misleading balance sheet constitutes a false statement about an asset.

Summit's argument stretches the meaning of "financial condition" further than even the broadest definition in existing case law. The projected costs of construction say nothing about Defendant's net worth or whether he owned an asset. And the Facility was not even built and there was no asset to own. The projected balance sheet was merely a forecast about future potential and thus not a representation of fact about financial condition. Summit failed to establish the required elements under 523(a)(2)(B) for summary judgment. For these reasons, summary judgment on this claim is denied.

D. <u>Willful and Malicious Injury Under 11 U.S.C. § 523(a)(6)</u>

Section 523(a)(6) provides a debt is nondischargeable if it was incurred

through willful and malicious injury by the debtor. To show willful and

malicious injury, the movant must show: (1) Debtor acted willfully, (2) Debtor

acted maliciously, and (3) Debtor's willful and malicious actions injured the

Plaintiff's property. *Owens v. Powell (In re Powell)*, 567 B.R. 429, 434 (Bankr.

N.D.N.Y. 2017).

*1. The Actions of Defendant Were Willful*

To meet the standard for willfulness, the Plaintiff must show "a

deliberate or intentional *injury*, not merely a deliberate or intentional *act* that

leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in

original).

As discussed above, Defendant's actions were willful. He intentionally

misrepresented the cost of construction. He knew Summit would rely on his

budget and be injured when its loan turned out to be for less than half of the

actual cost of a building they thought would be complete. Defendant had

actual knowledge that Summit expected rents from tenants would serve as

collateral for the loan. Yet he also knew no tenants would be present in an

incomplete, unusable building.[3] With no revenue, there would be no way to

repay the loan, and as a result Summit would be injured. A shell building

---

[3] The WRMC Lease is for office space detailed in an attached floor plan. It says
occupancy would commence "upon construction completion." Even assuming the
WRMC Lease was genuine, occupancy contemplated a complete, habitable building.

would not be usable and substantial additional money would be required to have a finished facility as represented in the true budget. Defendant admits he knew this. Defendant's actions were intentional.

### 2. Malicious Conduct is Present

The remaining issue is whether Defendant's conduct was "malicious" under section 523(a)(6). While the holding in *Tinker v. Colwell*, 193 U.S. 473 (1904), may seem anachronistic, its holding that the necessary degree of malice may be implied from the circumstances remains appropriate.[4]

Maliciousness has generally been held to encompass "implied or constructive malice as well as actual malice." *In re McGuffey*, 145 B.R. 582, 586 (Bankr. N.D. Ill. 1992). Implied malice may be shown "by the acts and conduct of the debtor in the context of [the] surrounding circumstances." *Navistar Fin. Corp. v. Stelluti (In re Stelluti)*, 94 F.3d 84, 88 (2d Cir. 1996) (internal quotations omitted); *see also In re Ikner,* 883 F.2d 986, 991 (11th Cir. 1989) ("Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice."). While the term "malicious" colloquially evokes spite, an injury may be malicious within this provision "if it was wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will." 4 *Collier on Bankruptcy* ¶ 523.12[2]. *See also First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 775 (7th Cir. 2013). On the other hand, injuries either negligently or recklessly inflicted do not come within

---

[4] *Tinker* arose under the Bankruptcy Act. Thus, the language of the statute was different in style from the current statute. Still, it addressed whether an injury was "willful and malicious."

the scope of the "willful and malicious injury" dischargeability exception.
*ColeMichael Invs., L.L.C. v. Burke (In re Burke)*, 398 B.R. 608, 625 (Bankr. N.D.
Ill. 2008).

Many courts hold one need not show specific intent to injure to show
malice, as malice can be established by showing intentional conduct certain, or
almost certain, to injure another. *Jendusa-Nicolai v. Larsen*, 677 F.3d 320, 324
(7th Cir. 2012) (defining willful and malicious injury as one "the injurer
inflicted . . . knowing it was highly likely to result from his act"); *Fischer v.
Scarborough (In re Scarborough)*, 171 F.3d 638, 643 (8th Cir. 1999) (an injury is
malicious under section 523(a)(6) if it is "certain or almost certain to cause . . .
harm"). Courts also define "willful" as injury being certain or substantially
certain to occur. *Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1165 (11th Cir.
1995) ("a debtor is responsible for a 'willful' injury when he or she commits an
intentional act . . . to cause injury or which is substantially certain to cause
injury"). It seems several courts group "willful" and "malicious" together in a
totality of the circumstances type of approach.

Defendant's repeated misrepresentations to Plaintiff are straightforward
evidence of malice. Although Defendant had no personal animus toward or any
reason to target Summit, he knowingly lied to Summit about the cost of the
project. He repeatedly misrepresented the cost for a completed building to be
about $2.5 million when he knew that figure was closer to $5 million.
Defendant gave Summit a business plan projecting the total cost to be around
$2 million, and he knew that was wrong. The project's balance sheet also

identified the "Cost of Construction" at $2.52 million. Defendant had bids from subcontractors showing the total budget would be closer to $5 million before he presented the cost of the project to Summit. Defendant lied when he submitted a budget for a completed facility knowing the budget would only result in a shell of a building.

Defendant decided to lie when asked about needing more money for the project. Rather than submit an accurate budget, he admits he "showed [Summit] a version that was under significantly." He knew more money was needed to construct the Facility. Defendant made the decision to inform Summit the true budget was closer to $5 million only *after* Summit had loaned around $2.5 million and much of the money had been disbursed.

Defendant had to have known his intentional misrepresentations were certain to financially injure Summit. Failure to complete the project would leave Summit with an incomplete, unusable building incapable of generating any revenue to repay the loan and of insufficient value to secure the loan. Defendant signed the April Contract and gave it to Summit knowing it contained language for completion of a 47,800 square foot facility when, in fact, that was untrue. The uncontroverted testimony of Krause is that Goldbeck told him to prepare a budget for only about one-half of the construction costs. Krause knew Goldbeck was giving that budget to Summit. Defendant had bids from subcontractors confirming a cost almost double the budget. He ignored or concealed those bids in dealing with Summit. The false amount used in the construction contract was the amount Defendant instructed Krause to use.

Trying to put a different spin on the facts, Defendant suggests Summit granted the loan to finance the construction of an unfinished building. He has produced no evidence in support of that suggestion. Defendant surely knew the $2.5 million loan was for a *completed* building, as the parties agreed rents from tenants would serve as collateral for the loan. A half-completed building generates zero revenue. He also concedes he knew additional money would be required.

Defendant went so far as to tell Summit the budget represented *savings* because of his good relationships with subcontractors. He submitted financial projections based on a completed facility knowing the loan would be insufficient to complete the Facility and generate any returns.

When told more financial support and a lease for part of the Facility were needed to close the loan, Defendant submitted a lease. Based on the record, it was not really signed by the tenant-to-be. There is evidence suggesting he may have forged a lease to induce Plaintiff into extending the loan. The signature on that lease is of questionable authenticity and the alleged signor submitted an affidavit stating he did not sign the lease or instruct anyone to sign it on his behalf. Whether forged or not, the building as constructed was not complete and would not have been ready for a tenant to occupy.

Defendant covered up his misrepresentations with more misrepresentations, creating a delicate house of cards built on one lie after another. Defendant's behavior was abhorrent from the start, as all along he intended to "keep the project going and address [the falsified budget] later." As

expected, Summit was left with a half-completed building incapable of generating revenue to repay the loan and a debt of $2.5 million.

These facts represent more than mere inadvertence, negligence, or recklessness. Defendant was too sophisticated for this to constitute one big misunderstanding, as Defendant's brief suggests. In communicating with Summit, Defendant referenced "what many businesses do," showing knowledge of industry practice. Defendant possessed enough overall awareness by retaining subcontractors and other professionals to help him prepare an appraisal, a feasibility study, a budget, a business plan, and other required documents. Defendant said he could secure additional funding from third parties when trouble with Summit began to brew. Defendant fully appreciated the situation. Instead of acting honestly, he chose to invent a budget for something he knew could not be built for the amount he used.

The entirety of the evidence goes against Defendant's claim of mistake. Defendant knew exactly what he was doing by intentionally withholding material information that would jeopardize his dream project from coming to fruition. There was no oversight or accidental behavior involved, and not a shred of evidence suggests Defendant exercised good faith or possessed honest intentions. He knew his honesty would have likely resulted in the loan not being made. His entire course of conduct was to deceive and defraud Summit.

After spending around $425,000 of his own money on the project before closing the loan, Defendant had every incentive to get the loan closed by any means necessary, including lying. Defendant strung Summit along on a ride of

22

deceit and trickery, only to pull the rug out from under Summit and reveal the actual cost months after the loan closed and Summit had disbursed most of it. Virtually no evidence suggests Summit had any reason to believe the budget of $2.5 million was for a half-completed building or the signature on the lease was anything but genuine.

Finally, Defendant has articulated no rationale, excuse, or justification for his deceit. Defendant's seemingly sincere belief the Facility would benefit the community does not change the fact that he entered into a project knowing at the outset it was overbudget and would not produce the returns anticipated by Summit. Defendant exercised complete bad faith throughout the negotiations and later events. Defendant is not the "honest but unfortunate debtor" for which the discharge was intended. Instead, he hoped to trap Summit into a Hobbesian choice of either lending more money or face trying to foreclose on a half-built structure.

### 3. The Debt is Nondischargeable Under 11 U.S.C. § 523(a)(6)

The facts confirm that Defendant engaged in an intentional act substantially certain to cause injury to Summit. The conclusion that Defendant's actions were malicious is inescapable. The nature of his act itself implies a sufficient degree of malice. Plaintiff has satisfied its burden of proof under section 523(a)(6).

## CONCLUSION

The Court grants summary judgment to Plaintiff under 11 U.S.C.

§§ 523(a)(2)(A) and (a)(6). Summary judgment on the claim under 11 U.S.C.

§ 523(a)(2)(B) is denied.

This decision shall constitute findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil

Procedure.

A separate order consistent with this decision will be entered.

Dated:  September 7, 2018

BY THE COURT:

_____

Hon. Catherine J. Furay
U.S. Bankruptcy Judge